IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| **BRUNO CLAY MANAGEMENT, LLC,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: _____ |
| ) | |
| **WALTER REED MF PARTNERS, LLC,** ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff Bruno Clay Management, LLC, by counsel, submits this Complaint pursuant to Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and states as follows:

**The Parties**

1. Plaintiff Bruno Clay Management, LLC ("Bruno Clay") is a general contractor limited liability company formed under the laws of Virginia with its principal place of business in Vienna, Virginia. Bruno Clay has no members who reside in or are citizens of Washington, D.C.

2. Defendant Walter Reed MF Partners, LLC ("Walter Reed") is a developer limited liability company formed under the laws of the District of Columbia with its principal place of business in the District of Columbia. Upon information and belief formed after reasonable inquiry, Walter Reed has no members who are residents or citizens of Virginia.

1

#10665240v2

## Jurisdiction and Venue

3. This Court has jurisdiction over this matter under 28 U.S.C. § 1332. There is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs and attorney's fees.

4. This Court is a proper venue under 28 U.S.C. § 1391 because a substantial part of the cause of action arose in this division of this district. The contract in question was made in Vienna, Virginia, and much of the work in question was carried out in Vienna, Virginia.

5. Simultaneously with executing the Contract, Walter Reed orally agreed with Bruno Clay that in the event of litigation regarding the Project, such litigation would be filed in Virginia and be governed by the laws of the District of Columbia.

## Facts

6. In August 2024, Bruno Clay as contractor and Walter Reed as owner entered into a contract (the "Contract") for the construction of a project called The Parks at Walter Reed Building 12 (the "Project").

7. The Contract consists of amended versions of AIA Documents A101 (attached hereto without its exhibits as **Exhibit 1**) and A201 (attached hereto as **Exhibit 2**).

### The Dispute Resolution Procedure and the Architect as Initial Decision Maker

8. Article 6 of **Exhibit 1** is titled "Dispute Resolution." To induce Bruno Clay to agree to use arbitration as the dispute resolution procedure in § 6.2, Walter Reed promised in § 6.1 that the Architect would be the Initial Decision Maker under the Contract for all claims and disputes between Bruno Clay and Walter Reed:

> The Architect will serve as the Initial Decision Maker pursuant to Article 15 of AIA Document A201–2017, unless the parties appoint below another

2

#10665240v2

individual, not a party to this Agreement, to serve as the Initial Decision Maker.

9. The parties to the Contract appointed no other individual to serve as Initial Decision Maker.

10. The Architect as Initial Decision Maker plays a key role in the Dispute Resolution provisions of Article 15 of **Exhibit 2**.  Importantly, in that role the Architect must "not show partiality to either" Walter Reed or Bruno Clay and must act in good faith.  **Exhibit 2**, § 4.2.12.  And, in good faith without partiality, the Architect as Initial Decision Maker must make the Initial Decision on every claim under the Contract.  *Id.*, § 15.2.  That Initial Decision is binding unless the Owner or the Contractor pursues it further.  *Id.*, § 15.2.5.

11. Bruno Clay reasonably relied upon these representations and promises by Walter Reed.  Without such representations and promises, Bruno Clay would never have agreed to arbitration as the dispute resolution mechanism under the Contract.

12. Walter Reed's representations regarding the Initial Decision Maker were knowingly false.  When Walter Reed signed the Contract, it intended, in order to save money, not to engage the Architect as Initial Decision Maker, and did not so engage the Architect.

13. As required under the Contract, Bruno Clay has submitted claims on the Project to the Architect, as Initial Decision Maker, with copies to Walter Reed.  Upon receiving Bruno Clay's claims, the Architect informed Bruno Clay that the Architect would not respond to the claims, that it is **not** the Initial Decision Maker, and that Walter Reed never contracted with the Architect to be the Initial Decision Maker.  Bruno Clay's claims have gone unanswered.

## The Architect as Contract Administrator

14. The Architect has numerous administrative duties under the Contract, duties that directly affect Bruno Clay. For example, the Architect must visit the site no less than once a week (**Exhibit 2**, § 4.2.2), and must make independent, impartial review of each application for payment submitted by Bruno Clay and either certify such application or provide a written response justifying non-payment of all or any portion of the application. **Exhibit 2**, § 9.3.

15. These representations and promises by Walter Reed were critical to Bruno Clay because they provide a guarantee of professionalism and impartiality regarding decisions that go to the heart of the benefits Bruno Clay bargained for, i.e., having an independent, impartial professional make the decisions regarding payment for Bruno Clay's work.

16. Bruno Clay reasonably relied upon these promises and representations.

17. Walter Reed knowingly misrepresented the Architect's role in the Contract. When it signed the Contract, Walter Reed knew that, contrary to the representations in the Contract, it had decided not engage the Architect to perform the required administrative duties in order to save money.

18. Rather than have the Architect visit the site once a week to, among other things, determine the percentage of completion under the Schedule of Values, and thus the amount that Bruno Clay would be due when it submitted its application for payment, Walter Reed had the Owner's Representative, Eric Jenkins ("Jenkins") perform that task. Jenkins is a partner in Walter Reed and therefore has an ownership interest in the Project and is clearly not impartial.

19. And rather than have the Architect review Bruno Clay's applications for payment and make an impartial determination of whether to approve them, Walter Reed told the Architect to rely on the non-impartial Owner's Representative to make that determination. The Architect

agreed with Walter Reed to follow this instruction, thereby repudiating the Architect's duties to Bruno Clay under the Contract.

20. Because the Architect was complicit in abdicating its duties under the Contract and in allowing Walter Reed to take over those duties while pretending to Bruno Clay that the Architect was doing them, the Architect's impartiality toward Bruno Clay is permanently tainted on this Project. Therefore, the Architect cannot now take on the role of Initial Decision Maker.

### Walter Reed's Duty of Financial Assurance to Bruno Clay

21. Because the Contract requires Bruno Clay to expend significant resources, buy materials and perform labor before getting paid for such work, assurance of Walter Reed's ability to pay Bruno Clay was critical to Bruno Clay.

22. **Exhibit 2**, § 2.2.2 allows Bruno Clay, following commencement of the Work, to make written demand to Walter Reed to furnish "reasonable evidence that the Owner has made financial arrangements to fulfill the Owner's obligations under the Contract," if "the Contractor identifies in writing a reasonable concern regarding the Owner's ability to make payment when due."

23. Walter Reed's failure to provide such evidence within 14 days of receipt of the demand allows Bruno Clay to stop work on the Project immediately. *Id*.

24. On November 30, 2025, Bruno Clay sent Walter Reed the email attached hereto as **Exhibit 3** stating "reasonable concerns regarding the Owner's ability to make payment when due."

25. Walter Reed responded with the letter attached hereto as **Exhibit 4**.

26. The only substantive statement in **Exhibit 4** is that financing from TD Bank and Main Street Bank "as understood by TD Bank, is in place to complete construction per the revised

outline." There is no way for Bruno Clay to know what is "understood by TD Bank" or what is meant by "complete construction per the revised outline."

27. More than 14 days have passed since Bruno Clay made the demand in **Exhibit 3**.

28. Bruno Clay contends that, by any objective standard, the brief statement from the bank in **Exhibit 4** is too vague and general to provide "reasonable evidence that the Owner has made financial arrangements to fulfill the Owner's obligations under the Contract," and, therefore, Bruno Clay is entitled to stop work immediately.

29. Walter Reed insists tfhat **Exhibit 4** satisfies its obligation under § 2.2.2 of **Exhibit 2**.

30. The parties have a genuine controversy, and Bruno Clay seeks a declaratory judgment regarding the parties' rights under the Contract.

## Relief Requested

WHEREFORE, Bruno Clay requests the following relief:

A. A declaration that Bruno Clay is not bound by the arbitration provision of the Contract because its agreement to arbitrate was fraudulently induced; and

B. A declaration that **Exhibit 4** is not "reasonable evidence that the Owner has made financial arrangements to fulfill the Owner's obligations under the Contract," and therefore Bruno Clay in entitled under the Contract to stop work immediately.

Dated: December 19, 2025

Respectfully submitted,

BRUNO CLAY MANAGEMENT, LLC

By: _____
Thomas M. Wolf, Esq. (VSB # 18234)

6

#10665240v2

Dale E. Wolf II, Esq. (VSB # 101561)
O'Hagan Meyer, PLLC
411 E. Franklin Street; Suite 500
Richmond, VA 23219
Telephone: (804) 361-4551
Facsimile: (804) 403-7110
Email: *Twolf@ohaganmeyer.com*
Email: *Dwolf@ohaganmeyer.com*

*Counsel for Plaintiff*

#10665240v2